Hocraffer v. HHS, 2009, 5115, Mr. Dannenberg. Good morning, Your Honors. May it please the Court, I'm Paul Dannenberg, and I represent Petitioner Casey Hocraffer, who was a 15-year-old girl who had two hepatitis B vaccinations in syndrome and thereafter significant neurological sequelae. This case involves damages. We already prevailed in the Court below on the issue, did the vaccine cause her injuries? The question is what the injuries are. But the Chief Special Master here relies on Dr. Hoibe, is that how we pronounce his name? Hoibe, actually. Hoibe? Dr. Hoibe, who's a real expert, I mean, he's the president of the Reyes Syndrome Foundation, and he testifies she only suffered 30 days at most. How do we question that kind of testimony and that kind of pretty substantial judicial reliance on a reputable expert? Well, Your Honor, he is a reputable expert as far as the physiological parts of Reyes Syndrome. He was not a neurologist. He's a gastroenterologist. You're not attacking his credentials, are you? We are attacking his credentials as far as neurology goes. We used him in the initial entitlement phase to determine if the vaccine could cause Reyes Syndrome. But he has admitted and did so in the damages phase of the case that the vaccine, that he has no experience in neurology, and he wasn't opining about the neurological symptoms, and his only experience was anecdotal. But the Chief Special Master makes it pretty clear that it's the most reputable testimony he has. Dr. Jacobson, he found very unreliable, unable to link migraines to Reyes Syndrome. At one point, linking hand numbness, and at another point, withdrawing that linkage. So well, Hybee is the best that this Chief Special Master had, right? Well, I don't think so, Your Honor, because... Can we question that kind of credibility finding anyway? I think so, because part of the credibility of Dr. Jacobson was determined because there was no medical literature that backed up his opinion, according to the Chief Special Master. But in fact, there was medical literature in Exhibit S, two articles that were completely ignored by both the Special Master and Judge Firestone in the court below, that link Reyes Syndrome with long-term neurological sequelae, even in mild cases, even in patients with grade 1 coma, and said that it's particularly applied to her age group, because she was 15 at the time of vaccination. It said that older children, even with low grades, can get settled long-term neurological sequelae from Reyes Syndrome. In other words, cognitive deficits, maladaptive behaviors... But the record also included testimony from Dr. McDonald, John McDonald, who, again, supported the Chief Special Master's judgment. That's true, Your Honor. But I think what tips the balance in this case... We're not going to be able to substitute one testimony for another. Are we here on appeal? We're just judging, did the Special Master rely in great error on what was in the record? Well, I think it's a balancing of the opinions. And we have a treating physician in this case, Dr. Ratnasamy, and his opinion was largely ignored. He said that... He saw Casey in April 97, and he said that his opinion was that the vaccine triggered a cascade of symptoms, including upper respiratory infection, headaches, hand numbness and fatigue. And under Capazano's previous ruling by this court, it said that the treating physician's testimony is highly probative of a logical sequence of cause and effect, and it should be given great weight. So I think if you balance the fact that we have this treating physician who actually saw Casey, and then we have a pediatric neurologist who gave an opinion that she had long-term sequelae, we have two medical articles that back up this opinion that were ignored against a neurologist that did not see Casey, and Dr. Hubie who's admitted during testimony that he did not have experience to opine on neurological issues. So... Your problem is you have fact questions, we have a substantial evidence standard, and you're two levels up on appeal, which kind of makes us hard to... It's true, Your Honor. I think the statute says that the Circuit Court of Appeals has the same review authority that the U.S. Court of Federal Claims has, and that review authority is... They can actually find facts and enter conclusions of law just as the U.S. Claims Court can. So you can do that. You do have the jurisdiction to do that according to the way the statute's written. You're saying we can find facts without witnesses here? Yes, I believe so, because it's the same jurisdiction, the same type of review. I don't think that's... What you're saying is we repeat, in a sense, on the fact issues. Isn't the law that we repeat what the Court of Federal claims to determine whether it's legally correct and whether there's any factual error? Substantial evidence. That's true. Factual error, and it's arbitrary or capricious. It says there are clear error of facts, and I think in this case there is, because the Special Investigator ignored this critical evidence. And the statute says that the Special Investigator has to review all of the evidence. It says that in a number of places, and the vaccine rules say that Special Investigator has to review all of the evidence. And both of these articles that were on point were reviewed by both of the courts below, and neither one of them addressed it. And Judge, and excuse me, Dr. Ratnasamy's opinion was also largely ignored. I mean, they took parts of it, but his opinion at the hearing in 2003 was ignored, and his expert affidavit was largely ignored as well. Now, this selective review is a violation of the statute and the vaccine rules. Now, the medical articles in question said that the age of onset was just as important as the coma grade. And all through the decisions, the judges repeatedly referred to the fact that she had mild symptoms, her coma grade was one. There is one actual medical record that said her coma grade was two in history. But the experts have reviewed it, and they agreed it was one. So, but these articles say that the grade is equally important as the age of onset, and they did not address that fact. The article said that even in a low coma grade, if the child is older, she can get serious neurological sequelae. And these, the respondent has argued that since these articles weren't reviewed by the experts, that they couldn't be that important. But the statute clearly says that the special master has to review all the articles. They don't need to be reviewed by an expert. In fact, the Grant case said that medical articles, that the court reviews medical articles or medical opinion. So there's no linkage between the two. And as a matter of fact, the special masters are supposed to be experts, and they're supposed to not have to need expert opinion on each and every medical article that's submitted. Well, but that article cautioned that only 33% of the variance in test scores was accounted for by the age of onset. So the article already has a great deal of wiggle room, shall we say. Well, we had both articles. It doesn't clearly indicate error on the part of the chief special master. Well, it's part of the circumstantial evidence that you have to look at the whole case, all the tissues of circumstantial evidence, the expert medical opinion, the articles that back up this If you take each one as individually, you can always find weaknesses in it. But we're talking in these vaccine cases about very rare occurrences, very rare illnesses by individuals that are susceptible to this type of illness, whether it's by genetics, or because of their physical or health conditions at the time of vaccination. So, you know, it's by its nature, we're talking about very rare, unusual circumstances. There's also other circumstantial evidence that the special masters, I think, viewed wrongly, and the court viewed wrongly, is the ammonia levels. We have an article by the New England Journal of Medicine that indicates if you have an ammonia level over 26, I forget the exact U moles, I think that's what the article said, the degrees, 26, then you have a significant increase in neurological sequelae or death from Reye's syndrome. And Casey had almost two and a half times that ammonia level. And both experts, Dr. Jacobson and Dr. McDonald, both testified that ammonia was a potent neurotoxin. So this is part of the circumstantial evidence, the theory of how Reye's syndrome was developed. Wasn't there contrary evidence about ammonia, though? Pardon me, your honor? Wasn't there contrary evidence about ammonia? I don't believe so. I think all the experts agree that she had a very high significant ammonia level. The only thing, they qualify that by the chief special master. But does it relate to Reye's syndrome? Yes, it relates directly to Reye's syndrome. It's one of the toxins that's produced by the body during Reye's syndrome. There are other toxins, but this is one of the most significant toxins. And the court discounted this evidence because they said it was just a risk factor. But again, it's circumstantial evidence. The New England Journal of Medicine did this large study and said that ammonia level was a significant risk factor for Reye's syndrome that leads to neurological injury. And we have an ammonia level that's two and a half times what they said was a dangerous level. Did any experts testify that ammonia was related to Reye's? Yes. Can you show us that in the record? There's a significant amount of testimony by Dr. Jacobson about ammonia. There's even testimony by Dr. Hybee that he agreed ammonia was a potent neurotoxin and could lead to neurological injury. There's also testimony by Dr. McDonald that he agreed that it was a significant neurotoxin effect. He agreed to my question when I asked him if he agreed that the ammonia level that Casey had was extremely high and could cause serious illness. He said yes. He said probably. So it's in the record. You're well into your rebuttal time. Do you wish to save it? Sure, I'll save it. All right, Mr. Milmo. Thank you. May it please the court, my name is Michael Milmo. I represent the Secretary of Health and Human Services. The special master fellow found that while the petitioner was entitled to a vaccine award, she actually prevailed on the issue of entitlement. She failed to show a long-term sequela to her Reye's syndrome. The special master's factual findings and determinations are entitled to great weight. And the standard review that this court uses, as Judge Rader talked about before, tells us that they're extremely hard to overturn. Petitioner's case is essentially an attempt to relitigate the case in front of your honors, to ask you to reweigh this evidence and to come to a contrary conclusion. Well, the special master acknowledged that ammonia is a neurotoxin, right? He did. The special master also, though, in response to your question to petitioner's counsel, heard other contrary evidence. There was evidence from numerous sources, including Dr. Hybee, who is a nationally known expert in the field of Reye's syndrome, and from Dr. McDonald, saying that this is only indicative of a risk factor, that you can have high ammonia levels in mild cases of Reye's syndrome, and you can have high ammonia levels in very severe cases. In other words, it's not diagnostic in individual cases? Not diagnostic in individual cases. What really matters is the mental state of the person. And that is, in this case, clearly at the very low end of the grade, it was categorized as a grade one. All experts agreed on that. There's no alteration of consciousness. Alteration in her mental status, and that's what's determinative. This case really came down to a classic battle of the experts. The chief special master just found that Dr. Jacobson was not credible, highly speculative, that he didn't meet the basic standards of reliability to be able to consider his testimony trustworthy. He found it confusing, said it lacked in precision, lacked in clarity, and most of all, that it didn't have any support for it in the medical records, the medical literature, the clinical course that Casey Hochrafer experienced. On the other hand, he looked at the testimony from Dr. McDonald. Dr. McDonald's opinion did reflect the medical records. It was supportive of the medical literature. And most importantly of all, it agreed with Dr. Hybee. Petitioners attempt to sort of distance themselves from Dr. Hybee's opinion at this point is, I think, extremely troublesome. The reason that they try to distance themselves from Dr. Hybee's opinion is because their theory of the case has changed and evolved along the way. You can see from Judge Firestone's first note where she quotes petitioner's counsel as saying, you know, we're not trying to say that the current disability is related to Reye's syndrome, but we think it lasted at least six months. When the respondent then said, no, the sequela of the Reye's syndrome was something more like 14 days, then petitioners voluntarily went out and got an affidavit from the expert who had testified for them before, this nationally known expert on Reye's syndrome, and said, no, it's more like 30 days. When their theory of the case changed later on, you know, we're 11 years into this case now, probably, you know, eight or nine years into the case, the theory changed, then Dr. Hybee didn't give them the opinion that they wanted, and so they try to distance themselves from Dr. Hybee's opinion. That's clearly not fair. Based on the testimony of Dr. McDonald and Dr. Hybee, the special master concluded that the matter had fully resolved within 30 days and that there is no long-term sequela. In this case, the special master did exactly what this court asked him to do. He looks at the evidence, he weighs it, he tests the reliability of the experts, and then he comes to a conclusion. The Court of Federal Claims did exactly what they're supposed to do, make sure that the special master does all of those things and that the decision is rational and reasonable, and we think clearly here that they did. The real question, I think, is whether the special master was arbitrary and capricious. Did he have a good basis for rejecting Dr. Jacobson's testimony, and we think clearly that he did. First of all, it dissented and contrasted completely with Dr. Hybee. Second of all, it contrasted with Dr. McDonald, who gave very credible testimony. Petitioner talks about Dr. Ratnasamy, but Dr. Ratnasamy is an infectious disease expert, and even in his original records, he says that Casey Hochrafter's headaches are due to sinus, and that's four months after the fact. The medical records just don't support Dr. Jacobson's testimony. There's no MRI, there's no CT scan that supports Dr. Jacobson's testimony. The special master correctly concluded that the only thing that Dr. Jacobson has to support his opinion are his own words. Dr. Jacobson's opinion, in essence, came down to whether the migraine headache could be tied to Reye's syndrome. Again, the special master found that testimony was in complete contradiction to Dr. Hybee's testimony, Dr. McDonald's testimony, the other treating doctors' testimonies, and that there's no medical literature to support it. Frankly, there's just nothing to support Dr. Jacobson's opinion, and try as they may, petitioners attempt to have this court relitigate that issue. It's completely inappropriate. As to the petitioner's argument about the two medical articles, again, this case has been going on for 11 years. The two articles that were put into the record by petitioners were put in several years before the hearing in a completely different context. They were attached to a motion that the petitioners filed, an interlocutory motion in front of Judge Firestone. Dr. Jacobson never testified about the medical significance of those articles. I don't want to make the same mistake that I think the petitioners make in trying to interpret those articles. I just heard Mr. Dannenberg say that Casey was 15 when she had the onset of her Reye's syndrome. In their brief on page 22, it says, in their view, that what the study stands for is the age of the patients in this study at onset of illness range from 61 months to 242 months, 5 to 20 years old. Well, is 15, does that make her an older child? Maybe yes, maybe no. I don't know. Mr. Dannenberg can't testify about that matter as he's, I think, attempting to do. Your honors can't know. That's the reason these articles were brought up in front of the special master and discussed at the hearing. Coincidentally, when petitioners make the statement in the expert testimony, I don't think that's true, because at no point during the hearing did Dr. Jacobson make as part of his analysis any talk about Reye's syndrome in older children. That was never part of any part of his analysis or description. To the extent that the petitioners are saying that these articles stand for the proposition that even in mild cases of Reye's Dr. Hybie said that that's possible, but it's only possible in very rare cases. It's not possible in a case like Casey Hochreifers, where she doesn't show any other indicia, no change in mental status, no change in alteration of consciousness. Unfortunately, I think that the articles are sort of a red herring that are being put in front of the court to say they missed this, and I don't think the special master missed it. I think he got the point pretty carefully. On the issue of whether Dr. Hybie should have been asked to participate by the chief special master, clearly the best person to be in that position to know whether the chief special master violated the order was Judge Firestone. She said no. She said it was perfectly appropriate for him to look at those articles. She told the chief special master to look at the entire record, to do what the Vaccine Act implores, look at all the reliable, all the relevant evidence, and the legislative history makes it clear from the act that he's required to take a diligent and a very careful look at the records, and that's exactly what he did. It would have been fundamentally unfair for Dr. Hybie's given the circumstances here that he was the expert that Judge Firestone reversed the original special master's decision on because of his credentials and his knowledge of Reye's syndrome. No, he's not a neurologist, but he is a leading expert on the specific disorder that's at issue here, and the chief special master makes it very clear that he's an expert on things like petitioners. I think also, raising their brief, the argument about pain and suffering at $5,000 for a case like this is just too low, and we disagree, and we think that the special master did, again, exactly what he's supposed to do. He looked at the individual circumstances of Casey Hocrafter's case. He put it in the context of other awards, which has been done for the entire 20-year history of the program. He determined, frankly, that this was just at the very low end of the scale, not much severity to this injury, didn't last long, and based on that, the award was appropriate. Awards of pain and suffering or discretionary matters, whether I might have awarded $2,500 or somebody else might have awarded $25,000 is sort of irrelevant at this point. He determined that $5,000 was appropriate. He had a good reason for doing it, and based on that, his entire decision should be affirmed. Thank you, Mr. Milmo. Mr. Danenberg has a little time. Your Honor, when the case was remanded back to the chief special master, one of the first things he did was to order us to file an opinion from Dr. Hubie, and at that same time, we were trying to find a neurological expert. It was difficult to find one with experience with Reye's syndrome, and so we followed court orders. That's why this opinion from Dr. Hyvie was filed. I don't believe Dr. Ratnasamy diagnosed Casey's illness as sinus infection. I think that was part of his differential diagnosis. Also part of the differential diagnosis was the vaccine, and by the time he got to the hearing and reviewed the complete medical records that we had sent to him, his opinion was clearly that the vaccine triggered her migraine headaches, her fatigue, and all the rest of it, and as such, her migraine headaches are still continuing. She was recently pregnant. She had to go to the hospital for migraine headaches because of the pregnancy, so this is a condition that still substantially impairs Casey, and she should be getting damages for that. The MRI scans, I think Dr. McDonald testified that they might not show evidence of migraines anyway, so the fact that the MRI and the CT scans did not show evidence of brain damage is irrelevant in this case. And the fact that these articles comport with Dr. Jacobson's testimony is because he testified about learning deficits from the Reye's syndrome, and he said Reye's syndrome was a disease that injures the brain, and that's exactly what these articles said, and further, Dr. Hyvie, despite what the respondents said, is not an expert on long-term outcome from Reye's syndrome. In fact, he testified specifically to the fact that he had no experience on long-term Reye's syndrome outcome except anecdotally. He's an expert on how Reye's syndrome develops in the body and the physiological effects Reye's syndrome has on the body, not on the neurological part, and he deferred to Dr. Jacobson's opinion. Now, I think the special master violated due process and basic fairness when he ordered Dr. Hyvie to become one of Casey's damages hearings experts. In the vaccine program, the damages, it's bifurcated. There's an entitlement hearing, and there's a damages hearing, and the statute, I believe, says that the evidence for the damages to file affidavits from Dr. Hyvie, he was acting as an additional prosecutor, an additional adversary of the petitioner, and I think the Richardson case in the federal claims court just issued by Judge Wheeler has ruled that special masters can't act this way. They have to act as an unbiased arbiter of the facts. They can't step forward and start being an additional adversary to petitioners. I think the Department of Health and Human Services and the Department of Justice is a sufficient adversary to the petitioner. You don't need the power of the Office of Claims Court. Mr. Dannenberg, you may not have noticed the red light is on. I'm sorry, but I would just say that we're requesting appropriate damages. Thank you. The case will be taken under advisement.